**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**

**Case No. 22-CR-20170-SCOLA**

**UNITED STATES OF AMERICA**

**v.**

**GZUNIGA, LTD,**
**NANCY TERESA GONZALEZ de BARBERI, and**
**DIEGO MAURICIO RODRIGUEZ GIRALDO,**

_____ **Defendants**. /

**GOVERNMENT'S REPLY TO DEFENDANTS GZUNIUGA AND**
**NANCY GONZALEZ' OBJEECTIONS TO THE PRESENTENCE**
**REPORT AND SENTENCING MEMORANDUM**

The Government, by and through the undersigned attorneys, respectfully submit this reply to defendants Gzuniga and Nancy Gonzalez' consolidated objections and sentencing memorandum, filed on April 18, 2024.[1]

I.    **The Presentence Investigation Reports**

The Government concurs with the description of the Offense Conduct set forth in Part A of each Presentence Investigation Report ("PSRs") prepared by the United States Probation Office for Defendant Nancy Gonzalez, dated January 17, 2024, and Gzuniga Ltd. dated January 18, 2024, _except_ for the description of Eric Schneider's role in the offense.  Contrary to the PSR's assertions, Schneider, did not solicit any of the couriers that smuggled "Nancy Gonzalez"

---

[1] This reply is filed on the afternoon prior to the sentencing hearing due to defendants' untimely filing of their Objections to the PSR and Sentencing Memorandum which includes 9 exhibits comprising 377 pages of information not previously disclosed to the government.

caiman / python skin handbags from Colombia to the United States – many of whom did not speak English.  He did not make any arrangements for couriers' travel or compensation for their smuggling activities.  Neither did Schneider give instructions to any couriers on how to deceive Colombian and U.S. CBP authorities.  Whereas, defendants co-defendants Gonzalez, Giraldo, and Soto, engaged in all these overt acts in Colombia to further their conspiracy.  Schneider never traveled to Colombia, nor does he speak Spanish.

The government concurs with the fair market value of the smuggled handbags reflected in the PSRs and the resulting 16-level increase to the offense level for defendant Gonzalez. However, the total offense level for Gonzalez should be reduced by 2 points in accordance with U.S.S.G. § 4C1.1 for qualifying as a zero-point offender.  As such, Gonzalez's total offense level should be reduced to 25 with a corresponding Guideline imprisonment range of 57 to 71.[2]

Lastly, the government concurs with the PSR finding that there are no circumstances warranting a departure or variance for either Gonzalez or Giraldo.

## II.   The Successful Scheme to Smuggle

Fashion is big business that generates millions of dollars in revenue for those designers and brands like Nancy Gonzalez that achieve and maintain recognition by the retail community and from the media.  Fashion events scheduled throughout the year provide the forums for designers to show off their collections to up-scale retailers, the media, celebrities, and internet influencers.  The most prestigious of these events are the two Fashion Weeks and Resort Week scheduled each year. "Fashion week" is a week-long fashion industry event that occurs in the United States and internationally in February and September each year.  The most prominent

---

[2] Defendant Mauricio Giraldo should also receive the same 2-point reduction.

Fashion Weeks are held chronologically in New York City, London, Milan, and Paris.  "Resort Weeks" typically occur in June.  These events are scheduled annually to follow the "retail cycle," allowing retailers sufficient time to purchase and incorporate the collection pieces into their marketing to the public.  They are significant to the success of a designer such as defendant Nancy Gonzalez, in that they facilitate media exposure, buyer interaction, networking, and celebrity endorsement.  As such, it is crucial for a designer or brand to have a collection or fashion line completed in time to be presented during a fashion event.  Failure to do so would result in a significant loss in sales, prestige, and the compromise of professional relationships within the fashion industry.  As predictable as sun rise and the tides, these events are known well in advance to all in the industry and the consequences on failing to plan and produce product to meet the industry events is equally clear to designers everywhere.

The principal goal of the defendants' scheme to use couriers to smuggle caiman and python skin designer handbags into the United States via passenger airlines was to transport Nancy Gonzalez' collection to each of the three fashion events held annually.[3]  During a period extending over at least three years, defendant Gonzalez repeatedly failed to conduct her business in a fashion to meet the industry deadlines, and conspired with codefendants Mauricio  John Aguilar, Paola Soto and numerous individuals acting as couriers to repeatedly smuggle designer handbags and women's accessories made from caiman and python skin into the United States. The product smuggled in this fashion comprised the entire "Nancy Gonzalez" brand collection shown in the Gzuniga showroom in Manhattan, New York, to upscale retail clients during fashion events occurring in February, June, and September, annually.  By using couriers to

---

[3] The majority of handbags smuggled by the defendants and couriers were made of caiman skin.

smuggle handbags into the United States and thereby circumventing the CITES permit process, Gonzalez was able to gain additional time to design and produce her line of merchandise before shipping the collection of handbags and other accessories to New York City for a given fashion event – providing her with a significant market advantage over competitors.

But "Nancy Gonzalez" brand handbags were smuggled for other reasons as well. Defendants and their couriers also illegally imported handbags to the United States to complete orders placed by retailers, to feature at press events, and to provide samples for internet influencers. The FWS' criminal investigation further revealed that defendants illegally imported caiman and python skins and products from Europe to Colombia as well. Handbags were also illegally exported by the defendants and their couriers from New York to Cali, Colombia to be repaired by Gonzalez's company C.I. Diseño Y Moda Internaccional (CDMI) facility and then transported back to their customers.

### III.  The Defendants

#### A.  Nancy Gonzalez

Defendant Nancy Gonzalez, a citizen of Colombia, is a renowned designer of women's accessories including handbags and sandals made from "precious skins." **See Gov Ex 1**, Nancy Gonzalez' profile page from the Gzuniga website.   She holds a bachelor's degree in economics from Colegio Liceo Versailles in Colombia, and is the founder, owner, and principal of defendant Gzuniga Ltd, and its parent company CDMI located in Cali, Colombia. She has been described by her employees and co-defendants as a micro-manager, involved in every aspect of her business, which turned out to be enormously successful. Since debuting at Bergdorf Goodman in 1998, her list of vendors grew to over 300 luxury retailers, including Saks Fifth

Avenue, Nieman Marcus, Harrod's, Tsum, Lane Crawford and Net-a-Porter.  Gonzalez also operated boutiques in Seoul, Korea, and Hong Kong.  *Id.*  As a sign of the labels' prestige, it was mentioned in the 2006 film "The Devil Wears Prada," and featured on the HBO television series "Sex and the City."  As a result of her success in the fashion business, Gonzalez achieved substantial wealth and maintained an opulent lifestyle, which contrasted with the codefendants and couriers she recruited to smuggle her merchandise into the United States.  **Gov Ex 2.** However, much of Gonzalez' success depended on that smuggling operation.

Gonzalez created and instituted the scheme to smuggle her handbags into the United States as charged in the indictment.  For at least three years, Gonzalez: (1) recruited her subordinate employees Giraldo, Aguilar, and Soto to join the criminal enterprise; (2) solicited other CDMI employees, relatives, friends, and friends and relatives of CDMI employees to act as couriers; (3) funded the purchase of airline tickets, hotel rooms, and the monetary compensation for the couriers to repeatedly smuggle her merchandise into the United States and; (4) instructed the couriers on what to say to deceive U.S. Customs and FWS inspectors should they be questioned about the smuggled handbags, thereby willfully causing these couriers to commit the additional offenses of making false statements in violation of 18 U.S.C. § 1001, and obstructing proceedings, in violation of 18 U.S.C. § 1505.

### B.  Gzuniga Ltd

Defendant Gzuniga Ltd., which employed no more than 5 people, operated a showroom in Manhattan, NY, for the display of "Nancy Gonzalez" collections of women's accessories for high-end retailers listed above during fashion events that occurred three times a year.  **Govt Ex 3,** Photo of "Nancy Gonzalez" brand handbags on display in the Gzuniga showroom.  After

viewing a "Nancy Gonzalez" collection, upscale retail clients would select and purchase the styles / models of handbags (and another accessories) to stock upon delivery, in their respective department store or boutique for retail sale.   "Nancy Gonzalez" brand handbags were sold by these retailers for an average of $2,600 a piece to the well to do and celebrity clientele.   CDMI, which employed 400 people, manufactured all the "Nancy Gonzalez" brand products sold in the United States and abroad.   PSR, pg. 26, ¶117.   According to the defendant Gonzalez, her companies were valued at 2 million dollars at the height of her business. *Ibid*.

## IV.  <u>Argument</u>

### A.  **Standard of Review**

The Eleventh Circuit reviews the reasonableness of the sentence for an abuse of discretion using a two-step process.   First, the Court looks at whether the district court committed any significant procedural error, then examines whether the sentence is substantively unreasonable under the totality of the circumstances and in light of the § 3553 factors.   *United States v. Cubero*, 754 F.3d 888, 893 (11 Cir. 2014).   This appellate review is deferential, and the party challenging the sentence has the burden of establishing unreasonableness.   *United States v. Clay*, 483 F. 3d 739, 743 (11th Cir. 2007).   Reversal occurs only if the district court has abused its discretion and made a clear error in judgment.   *United States v. Brown*, Fed.Appx. 437, 439 (11th Cir. 2008)(unpublished) citing *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).   Although the Eleventh Circuit does not apply a presumption of reasonableness to a within guidelines sentence, the Appellate Court would "ordinarily…expect a sentence within the Guidelines range to be reasonable." *United States v. Docampo*, 573 F.3d 1091, 1101 (11th Cir. 2009) citing *United States v. Talley*, 431 F.3d 784, 788 (11th Cir. 2005).

### B.   The Guidelines

Although they are no longer mandatory, the Guidelines still provide strong guidance to the Court following *United States v. Booker*, 543 U.S. 220 (2005).   "[A] district court should begin all sentencing proceedings by correctly calculating the applicable Guidelines range" – that range "should be the starting point and the initial benchmark." *Gall v. United States*, 128 S. Ct. 586, 596 (2007); *United States v. Campbell*, 765 F.3d 1291, 1298 (11th Cir. 2014).   The Guidelines' relevance throughout the sentencing process stems in part from the fact that, while they are advisory, "the sentencing statutes envision both the sentencing judge and the Commission as carrying out the same basic § 3553(a) objectives," *Rita v. United States*, 127 S. Ct. 2456, 2463 (2007), and the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall*, 128 S. Ct. at 594; see also *Rita*, 127 S. Ct. at 2464.

The applicable sentencing guideline for the offense of conspiracy to smuggle, charged in Count 1 and the underlying substantive offense of smuggling designer handbags made from caiman skin charged in Count 2, is U.S.S.G. § 2Q2.1, entitled "Offenses involving Fish, Wildlife and Plants."   U.S. Sentencing Guidelines Manual Appendix A (2018).   The defense did not object to the application of this guideline to these charged offenses to which Gzuniga and Nancy Gonzalez pled guilty.

### 1.   The base offense level and pecuniary gain

Section 2Q2.1, sets forth a base offense level of 6 in subsection (a) and a specific offense characteristic for pecuniary gain of +2 in subsection (b)(1).   The defense did not object to the application of these two guidelines.

2. Market Value

    a.  Fair-Market Retail Price

Since the offenses to which the defendants pled guilty were conspiracy to smuggle and the actual smuggling of "Nancy Gonzalez" caiman and python skin *handbags*, it is the market value of these wildlife products that must be determined by the Court to calculate the specific offense characteristic under § 2Q2.1(b)(3). Therefore, the defense's contorted argument that market value should be the price paid by CDMI for the skins used to manufacture these handbags makes little sense and is contrary to law. The caiman and python *skins* were not smuggled into the United States. The handbags were. That was the objective of the defendants' conspiracy. Basically, the defendants are attempting to apply the guidelines to an offense to which they did not plead guilty.

The cases cited by the defense in support of their argument are likewise inapplicable. *United States v. Hughes*, 795 F3d. 800, 808 (8th Cir. 2015) does not address the term "market value" as defined in sentencing guideline § 2Q2.1. Whereas, in *United States v. Butler*, 694 F.3d 1177 (10th Cir. 2023), the offense of conviction to which the 2Q2.1 was applied by the Court was a Lacey Act violation, not smuggling. *Butler c*an be further distinguished on the grounds that guiding fees, which included accommodations and other incidental costs, constituted the "fair-market retail price," are not analogous to a product made from the protected wildlife skin that is sold to a willing purchaser.[4]

Pursuant to § 2Q2.1(b)(3) of the Guidelines, where the market value of the wildlife exceeds $6,500 the offense level shall increase by the number of levels from the table found in

---

[4] It should also be noted that although the *Butler* Court found that guiding fees should not be included in "fair-market retail price," the Ninth Circuit came to the opposite conclusion. See *United States v. Atkinson*, 966 F.3d 1270 (9th Cir. 1992).

Section 2B1.1 of the Guidelines.  Application n.4 to § 2Q2.1 provides that "[w]hen information is reasonably available, the market value under subsection (b)(3)(A) shall be based on the fair-market retail price.  Where the market value is difficult to ascertain, the court may make a reasonable estimate using any reliable information…."  Application n.4's interpretation of "market value" is authoritative and constitutes a binding interpretation of that term set forth in the Guideline.  *United States Eyoum*, 84 F.3d 1004, 1007 (7th Cir. 1996) citing *Stinson v. United States*, 508 U.S. 36, 37-39 (1993).  Therefore, to properly determine the guideline enhancement to the offense level under 2Q2.1(b)(3)(A), the Court must first attempt to discern the fair-market retail price, and only if that price is not readily available, may it resort to an estimation of the wildlife's value.  *United States v. Rodebaugh*, 798 3d 1281, 1299 (10th Cir. 2015).

The Circuits have consistently upheld a district court's use of the fair-market retail price to determine market value.  *United States v. Levine*, 743 Fed.Appx 154 (9th Cir. 2018) (Unpublished)(district court's use of the Asian retail market price of $20,000 to 29,000 per pound of rhino horn, based on government's evidence, to impose a 10-level enhancement was not an abuse of discretion); *United States v. Dove*, 247 F.3d 152, 159 (4th Cir. 2001)(district court's calculation of the market value of bear gall bladders which was the highest price for which it had reliable evidence – the resellers average retail price of $280 each - was not clearly erroneous);  *United States v. McDougal*, 216 F.3d 1074 (2d Cir. 2000)(Table)(district court's markup to convert the wholesale price of fish included in the PSR into retail prices, although flawed, was a reasonable estimate of the fair-market retail price to support a 13-level enhancement); *United States v. Borden* 10 F.3d 1058, 1063 (4th Cir. 1993)(market value adduced using the total retail price of illegally taken mussels purchased and then resold by

defendant to customers was in accord with the guidelines and supported 5-level enhancement, rejecting defendant's argument that only the profit he made from the wildlife should be considered); *United States v. Hand* 114 F.3d 1196 (Table), 1997 WL 265108 (9th Cir. 1997)(district court's decision to use grocery store prices to determine fair market value of halibut rather than wholesale price defendant received over his dockside just a few blocks away was in accordance with the plain language of the Guidelines which require use of the fair-market retail price).

Since the smuggled "Nancy Gonzalez" brand caiman skin handbags were sold by high-end retailers, information is readily available as to their fair-market retail price. Unfortunately, because the handbags smuggled by the defendants to complete Nancy Gonzalez' collections (i.e. "samples") were not documented, the government does not know which styles or models of handbags were smuggled.[5]  Therefore, the average retail price would be a reasonable estimate. A simple review of the retailers' websites which provide pictures and descriptions of each item of merchandise, reveals that Nancy Gonzalez' designer handbags made from caiman and or python skin sell for an average unit retail price of $2,600. **Gov Ex 4,** Pages from Bergdorf Goodman and Saks Fifth Avenue online catalogues and spreadsheet calculating the average retail price of the handbags depicted; **Gov Ex 5,** Spreadsheet of filtered data provided by the Neiman Marcus Group.

However, the government recognizes and would advise this Honorable Court that Gzuniga did not sell "sample" handbags that were on display in the showroom at the full retail

---

[5] It should be noted that the production and shipping information necessary to conduct such an analysis would clearly have been in the possession and control of the defendants during the period of the purported extensive cooperation and document production described by their various counsel. One must conclude counsel were unaware of these documents since clearly they were never produced to the government.

price.  Rather, these handbags were sold at "Sample Sales" or at a price that was typically from 50% to 75% off retail.  Gzuniga hired a third-party vendor to conduct these Sample Sales.  Over the course of the investigation the government obtained sample sales records from two of these third-party vendors for 2018 - 2019.  Again, because the government does not fully know which model or style of Nancy Gonzalez handbag were smuggled into the U.S., an average sale price from the available data is the most reasonable estimate – which in this case would be $1,435. **Exhibit 6,** Spreadsheet entitled "Handbag Sample Sale Value Average."

       b.   Number of bags smuggled into the United States.

To lawfully import Nancy Gonzalez' brand of women's accessories made from caiman or python skin, CDMI was required to apply for and obtain a CITES permit from Colombia's Ministerio De Ambiente Y Desarrolo Sostenible.  According to defendant John Aguilar, this process takes several days to a couple of weeks to complete.  Once the CITES permit was secured, CDMI created tags which displayed a CITES number and were affixed to each individual caiman skin or python skin "Nancy Gonzalez" brand product prior to export.  **Gov Ex 7,** Photo of CITES tags attached to Nancy Gonzalez caiman skin handbags. Staff at CDMI then notified Corbett International Inc., a trade broker based in New York, to complete an FWS Declaration Form 3-177 online.  Invoices were created and included in the cargo shipment. When the wildlife products arrived in the U.S., both the CITES permit and the Declaration Form 3-177 were required to be presented by the importer to the FWS Inspectors at the port of entry – either John F. Kennedy or Miami International Airports.

Prior to 2016, FWS authorized Gzuniga to import handbags on a limited number of occasions via passenger airline - as a courtesy - but the legal requirements were the same.  A

CITES permit and an FWS Declaration was still required to accompany the imported items and be presented to the FWS at the port of entry.  These authorized passenger imports consisted of a single CDMI employee being provided multiple items of merchandise with CITES tags attached, properly packaged in boxes, and accompanied by waybills or invoices.  The wildlife would be checked as baggage and loaded into the baggage compartment of the commercial airplane. CDMI would notify Corbett International of the impending import so the broker could arrange for FWS to meet the CDMI employee to clear the shipment.  However, the FWS withdrew this authorization in early 2016 as these imports on passenger aircraft were very difficult to accommodate because the CDMI employee would often not arrive during business hours when FWS staffed a particular airport, and due to due to lack manpower.  Occasionally, at the written request of Gzuniga or Corbett, an exception to the passenger import prohibition was granted – but, again, all the legal requirements were still required to be met.  **Gov Ex 8,** Spreadsheet of all declared Gzuniga U.S. Imports via Passenger Terminal 2016 to 2019.

 In contrast, the illegal imports perpetrated by the defendants and their co-conspirators, beginning no later than February 2016, involved multiple passengers, each routinely transporting only four "Nancy Gonzalez" brand caiman skin handbags, without CITES tags and unaccompanied by airwaybill or invoice, and without a CITES permit or a FWS Declaration 3-177.

As reported by Paula Soto, John Aguilar, and Eric Schneider (Gzuniga's former General Manager), over the three years charged in the indictment many couriers were sent by the defendants to the United States while transporting "Nany Gonzalez" caiman or python skin products without a CITES permit or Declaration Form 3-177.  Soto, Aguilar, and Schneider, all

reported that the smuggled handbags failed to contain the CITES tags, were not packaged in boxes, and were not accompanied by an invoice (as was the legally imported merchandise). During a series of interviews, Soto reported: (1) that there were times during the Collection events that up to forty passengers were requested to smuggle "Nancy Gonzalez" brand handbags into the U.S.; (2) that every day, for approximately a week, passengers from Colombia would smuggle "Nancy Gonzalez handbags" into the U.S. without CITES permits for a Collection event and; (3) for the fashion weeks occurring on or about March 2018, June/September 2018 and March 2019 there were "…approximately twenty (20) passengers per Collection event smuggling approximately four designer handbags each," for a total of 240 brand handbags illegally imported for the three-fashion events (20 x 4 x 3).[6]  Projected over the period of the conspiracy as charged in the indictment, the number of handbags smuggled amounts to 720 handbags.  On the other hand, Eric Schneider estimated that approximately 1,000 handbags were smuggled over the duration of the conspiracy charged in the indictment to make up "Nancy Gonzalez" collections.  For his part, John Aguilar reported that the quantity of handbags smuggled during the three fashion collection periods each year depended on the number of handbags that were designed for a particular collection season and CDMI's biggest collection, consisting of 80 to 100 handbags was produced for the Fall season.  All three witnesses further reported Nancy Gonzalez handbags were also smuggled to fill order placed by retailers or to presented at media events or individual showings to VIPs, such as celebrities or Tik Tok

---

[6] While preparing Ms. Soto to testify at sentencing, she clarified that over the course of the conspiracy, 80 handbags were not always smuggled for a collection – sometimes it was less. Soto could not recall for which Collections less than 80 handbags were imported.   But, considering her earlier more contemporaneous recollection, the statements made by Eric Schneider and John Aguilar, and the fact that handbags were imported for other purposes such as to fill orders and for media events, the government believes that 80 handbags per collection is a conservative estimate at the low end of the range of handbags smuggled by the defendants and their coconspirators.

influencers, - which would add considerably to the total of illegal "Nancy Gonzalez" merchandise brought into the U.S. by the defendants and their coconspirators.

A review and comparison of documents obtained during the FWS criminal investigation by Senior Special Agent Curtis Knights yielded a range of 788 to 1,307 Nancy Gonzalez' handbags smuggled from 2016 to 2019.  **Gov Ex 9.**

Using a conservative estimate of the retail price of $2,000, of each handbag (well below the average), the total market value would be as follows:

| Total Handbags Smuggled | | Retail Price | Total Market Value |
|---|---|---|---|
| Soto | 720 handbags | $2,000 | $ 1,440,000 |
| Schnieder | 1000 handbags | $2,000 | $ 2,000,000 |

Using a conservative estimate of the sample sale price of $1400, the total market value would be as follows:

| Total Handbags Smuggled | | Sample Sale Price | Total Market Value |
|---|---|---|---|
| Soto | 720 handbags | $1400 | $ 1,008,000 |
| Schnieder | 1000 handbags | $1400 | $1,400,000 |

But neither estimate includes handbags smuggled to fill orders and presented at media and other events. After these handbags were smuggled by courier, an invoice would later be sent by a CDMI staffer, such as defendant John Agular, to Gzuniga General Manager Eric Schneider. **Gov Ex 10,** Invoices sent by John Aguilar to Eric Schneider via email.

<u>Defendants' Aggravating Role in the Offense</u>

The defense did not contest application § 3B1.1(a) of the Guidelines to Nancy Gonzalez conduct resulting in a four-level increase in offense level because she was "… an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive."

### C.  The Statutory Sentencing Factors

After making the initial Guidelines calculation, a sentencing judge must then consider seven factors outlined in Title 18, United States Code, Section 3553(a): "the nature and circumstances of the offense and the history and characteristics of the defendant," 18 U.S.C. § 3553(a)(1); the four legitimate purposes of sentencing, see *id.* § 3553(a)(2); "the kinds of sentences available," *id.* § 3553(a)(3); the Guidelines range itself, see *id.* § 3553(a)(4); any relevant policy statement by the Sentencing Commission, see *id.* § 3553(a)(5); "the need to avoid unwarranted sentence disparities among defendants," *id.* § 3553(a)(6); and "the need to provide restitution to any victims," *id.* § 3553(a)(7). See *Gall*, 128 S. Ct. at 596 & n.6.

In determining the appropriate sentence, the statute directs judges to "impose a sentence sufficient, but not greater than necessary, to comply with the purposes" of sentencing, including:

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner.

18 U.S.C. § 3553(a)(2). To the extent District Court imposes a sentence outside the range recommended by the Guidelines, the Court must "'consider the extent of the deviation and

ensure that the justification is sufficiently compelling to support the degree of the variance.'" *Cavera*, 550 F.3d at 189 (quoting *Gall*, 128 S. Ct. at 596).

1. § 3553(a)(1) – Nature and Circumstances of the Offense and History and Characteristics of the Defendant

   a. Nature and Circumstances of the Offense

A sentence within the Guidelines range is supported by the nature and circumstances of the offense. 18 U.S.C. § 3553(a)(1). As the Court is aware, the Indictment and 12-page statement of Offense Conduct in the PSR included details of an extensive criminal scheme to flaunt U.S. customs laws for the ultimate profit of Nancy Gonzalez and her companies. The offenses to which defendants Gonzalez and Giraldo pled guilty were pervasive, extensive, intentional, and serious. Their criminal conduct did not involve a solitary violation or mistake that might be explained as a single instance of bad judgment or even a limited scope of misconduct. Rather, the offenses committed by these defendants took place over a three-year period, and they had full knowledge that they were breaking the laws of the United States and other jurisdictions and causing many others to do the same. The defendants' unlawful activity involved extensive planning and funding, the use of a legitimate business to conceal their illegal conduct, and numerous accomplices and co-conspirators, as well as deception to obstruct government authorities in performing their lawful functions.

   b. History and Characteristics of the Defendant

A sentence within the advisory Guidelines range is also supported by "the history and characteristics of the defendant." 18 U.S.C. § 3553(a)(1). Afforded every opportunity – a profitable business, relative wealth – to live a law-abiding life, Gonzalez (and Giraldo) chose to repeatedly flout the laws of the United States and Colombia for profit and involve fifty or so

others to execute their scheme to smuggle handbags.  Gonzalez funded the scheme and instructed the couriers to lie to customs authorities as to why they possessed and transported the caiman skin or python skin handbag.   This criminal activity was repeated many times over the three-year period set forth in the indictment.

   2.   The § 3553(a)(2) Factors

   a.   Seriousness of the Offense, Respect for the Law, and Just Punishment

Given defendant's criminal conduct, a sentence in the advisory Guidelines range is needed "to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense." 18 U.S.C.§ 3553(a)(2)(A). Defendants committed repeated acts of smuggling, an offense that carries a maximum prison sentence of 20 years.  Congress has made clear that smuggling is a very serious offense.  Moreover, Gonzalez repeatedly solicited her own employees, relatives, friends, and friends of employees to smuggle her designer brand handbags into the U.S. – thus exposing them to serious criminal liability in the United States, detention, and deportation.  She further instructed these couriers to lie to U.S. Customs and FWS inspectors by claiming the handbags were for personal use in violation of 18 U.S.C. § 1001 and §1505 - themselves serious offenses.  She has demonstrated no respect for the law.  Motivated by greed, she deliberately undermined the integrity of customs and border enforcement both in the United States and Colombia.

   b.   To afford adequate deterrence to criminal conduct

A sentence consistent with the Guidelines will afford adequate deterrence to criminal conduct.  Gonzalez (and Giraldo) were fully aware that their conduct was criminal in nature and that if caught, they faced the likelihood of a substantial period of incarceration. Additionally,

Gonzalez (and Giraldo) were specifically put on notice that the smuggling of the handbags was prohibited yet continued their criminal enterprise.  Even after couriers were detained, questioned and handbags seized, Gonzalez remained undeterred and continued her criminal enterprise.[7]  A guideline sentence is necessary to deter Gonzalez and other would-be smugglers from engaging in this type of criminal activity in the future.

    c.   Need to Avoid Unwarranted Sentencing Disparities

Imposition of a sentence within the advisory Guideline range best serves "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." 18 U.S.C. § 3553(a)(6). In creating the Guidelines, "Congress sought *uniformity* in sentencing by narrowing the wide disparity in sentences imposed by different federal courts for similar criminal conduct." *United States v. Rita*, 551 U.S. 338, 349 (2007). Even after Booker, "uniformity remains an important goal of sentencing." *Kimborough v. United States*, 553 U.S. 85, 107 (2007). The Guidelines "help avoid excessive sentencing disparities," *id.*, because avoidance of unwarranted disparities was clearly considered by the Sentencing Commission when setting the Guidelines ranges," *Gall v. United States*, 552 U.S. 38, 54 (2007), and because most defendants are sentenced within the Guidelines ranges, see *Peugh*, 133 S.Ct. at 2084.

The court need look no further than the sentence imposed on codefendant Paola Soto, Case No. 22-CR-20001-Altonaga.  Chief Judge Altonaga sentenced Ms. Soto to 31 months incarceration for the same conduct to which both defendants Gonzalez and Giraldo pled guilty. There are many other examples of significant sentences in wildlife cases based on the market

---

[7] See Overt Acts 6, 11, 22, 23, 24 – all of which concluded with the courier or co-defendant being detained, false statements being made, handbags seized and then abandoned by the courier, and an administrative fine being paid.

value of the wildlife, including the following: *United States v. Tania Siyam*, No. 1:04-CR-00098 (N.D. Ohio) (upward departure in 2008, 60 months for Lacey Act and smuggling charges involving ivory with market value of $158,000); *United States v. Olivia Terrance et al.*, No. 8:12-CR-00376 (N.D. N.Y.) (18 months for Lacey Act and ESA conspiracy to smuggle reptiles out of the U.S.); *United States v. Dennis E. Rodebaugh et al.*, No. 1:10-CR-00444 (D. Colo.) (41 months for Lacey Act violations involving hunting of elk and deer); *United States v. Tamba Kaba*, No. 1:09-CR-00858 (E.D.N.Y.) (33 months for Lacey Act and smuggling involving smuggling of ivory); *United States v. Ivan and Gloria Chu*, No. 10-CR-0003 (D.V.I.) (30 and 20 month sentences for smuggling black coral); *United States v. David Place et al.*, Nos. 1:08-CR-10098 and 1:09-CR-10152 (D. Mass.) (33 months for Lacey Act and smuggling violations involving sperm whale teeth and narwhal tusks); *United States v. Steven Patrick Garcia, Jr.*, No.12-CR-00039 (D. Mont.) (24 months for Lacey Act and MBTA violations involving sale of eagle feathers); *United States v. Eliodoro Soria Fonseca*, No. 3:11-CR-03328 (S.D. Calif.) (24 months for smuggling iguana meat); *United States v. James Bobby Butler, Jr., et al.*, No. 6:10-CR-10089 (D. Kansas) (41 and 27 month sentences for Lacey Act interstate trafficking and other offenses related to deer hunting); *United States v. Enrique Gomez De Molina*, No.1:11-CR-20808 (S.D.Fla.) (20 months for smuggling wildlife for taxidermy pieces); *United States v. Karen Blyth et al.*, No. 1:10-CR-00011 (S.D. Ala.) (33, 24 and 13 month sentences for Lacey Act and other violations related to smuggling and mislabeling of seafood); *United States v. Danny Parrott*, No. 2:09-CR-00045 (S.D. Ohio) (21 months for Lacey Act violations involving deer hunting); *United States v. Christopher Rowland*, No. 5:08-CR-00001 (D. Alaska.) (37 months for Lacey Act and Marine Mammal Protection Act violations involving hunting and export of sea

otters, sea lions and seals); *United States v. Herman Oyagak*, No. 04-CR-00034 (D. Alaska) (84 months for illegally taking walruses); *United States v. George Waters*, No. 03-CR-230 and 231 (S.D. Iowa) (57 months for Lacey Act violations involving poaching of deer and elk); *United States v. Arnold Bengis et al*., No. 1:03-CR-00308 (S.D.N.Y.) (46, 30 and 12 month sentences for Lacey Act violations involving smuggling of rock lobster and toothfish); *United States v. Michael Barrera et al.,* Nos. 03-CR-166 and 04-CR-203 (M.D. Fla.) (37 and 24 month sentences for reptile smuggling); *United States v. Robert Gehl et al*., No. 93-CR-300 (N.D.N.Y.) (Lacey Act and other offenses resulting in sentences of 87 and 70 months in conspiracy to sell tainted salmon roe); *United States v. Lawrence Wee Soon Chye*, No. 6:03-CR-166 (M.D. Fla.) (37 months for smuggling reptiles); *United States v. Tony Silva*, 94-CR-760 (N.D. Ill.) (82 months and $100,000 fine for smuggling CITES protected wildlife and tax charges). *United States v. David H. McNab et al*., No. 00-CR000079 (S.D. Ala.) (97 months for Lacey Act, smuggling and other offense in sale of undersized spiny lobsters from Nicaragua). *United States v. George Waters*, No. 03-CR- 230 and 231 (S.D. Iowa) (57 months Lacey Act offenses for illegal hunting of deer and elk); *United States v. Anson Wong*, No. 98-CR-165 (N.D. Cal.) (71 months for Lacey Act and other offense related to trafficking in reptiles); *United States v. Mariusz Chomicz*, No. 03-CR-20915 (S.D. Fla) (30 months for smuggling caviar); *United States v. Panhandle Seafood et al*. N.D. Fla  (51 months for Lacey Act and other offenses for illegal import of catfish).

## V. <u>United States v. Eric Schneider</u>

As stated in the government's objections to the PSR, the evidence produced by the FWS criminal investigation established that Gzuniga's General Manager, Eric Schneider, was not a co-conspirator.  Unlike the defendants, Schneider never smuggled handbags into the United States.

He never recruited or solicited anyone to smuggle handbags into the United States, never made travel arrangements for the couriers, paid them to smuggle or instructed them to lie. Whereas the defendants performed all these acts (and more) in furtherance of their conspiracy in Colombia. Eric Schneider has never been to the CDMI facility in Colombia. Moreover, when Schneider asked defendant Nancy Gonzalez about the regularity of the imports, she willfully falsely represented that the couriers could lawfully import up to four caiman skin handbags under what she termed a "personal exemption." Defendant Gonzalez repeated this false claim of personal exemption to Schneider after the FWS criminal investigation commenced when she called to notify him that her attorneys (presumably Mr. Jack Fernandez and Marcos Hasbun) would be contacting him.

### VI. United States v. Annsley Popov

Defense argues that defendant Annsley Popov was treated more favorably than their client. Annsley Popov's case is distinguishable from defendants on many grounds. Ms. Popov did not solicit, organize, arrange, facilitate, or conspire with any other person to get involved in a scheme to smuggle or to smuggle merchandise into the United States. She did not provide funding for couriers to do so, nor did she instruct her own employees to lie to federal inspectors and agents. She did not continue her criminal enterprise after couriers were caught and the handbags seized. So, it cannot be credibly argued that Ms. Popov's conduct was "arguably more egregious" than that of defendant Nancy Gonzalez. Furthermore, the fair-market retail price of the merchandise Ms. Popov illegally imported was substantially less than that of defendant Nancy Gonzalez. For these reasons, a sentence of imprisonment within the guideline range

imposed upon defendant Nancy Gonzalez would not be a disparate sentence of a "similarly situated" defendant.

It should also be noted that contrary to Ms. Popov's assertions, the criminal investigation of her smuggling activity was commenced by the FWS several years before the Environmental Crimes Section was asked to assist. Mr. Powers did not initiate the criminal investigation of Ms. Popov. Moreover, Mr. Powers did not have contact with any other U.S. district other than the Southern District of Texas, where Ms. Popov was charged, pled guilty and sentenced.

**VII. <u>Alleged Forum Shopping</u>**

This accusation is ludicrous and completely irrelevant to Ms. Gonzalez' case. Venue exists where the offense was committed. Fed. R. Crim P. 18. There is no constitutional right to a trial in a particular division or district, even where it is inconvenient for the defendant. *United States v. Merrill*, 513 F.3d 1293 (11th Cir. 2008). An offense committed in more than one district may be prosecuted in any district in which such offense was begun, continued, or completed. *United States v. Rutigliano*, 790 F3d. 389 (2nd Cir. 2015). Conspiracy may be prosecuted in any district in which the agreement was formed or in which there was an act in furtherance thereof. *Whitfield v. United States*, 543 U.S. 209 (2005). In this case, the smuggled "Nancy Gonzalez" brand caiman skin handbags entered the U.S. through two ports-of-entry, John F. Kennedy (JFK) Airport in the ED NY and Miam International (MIA) in the SD FL. Paola Soto's case was initially brought in the EDNY because that is the U.S Attorney's Office (USAO) that initiated the criminal investigation against Gzuniga and Nancy Gonzalez well before Mr. Powers was involved. ECS was not brought into the case until mid-2019, whereupon Mr. Powers contacted AUSA Watts-FitzGerald and notified him that FWS was investigating

Gzuniga and Nancy Gonzalez for smuggling offenses that occurred at MIA. Subsequently, Soto was arrested at MIA on December 19, 2019.  After her arrest, Soto posted bond and took up residence in the Miami area pending the resolution of her criminal case.  Moving her case to the SD FL meant that neither Soto nor her attorney would be required to travel to NY to make court appearances.  Most importantly, after the decision was made to indict defendant Gzuniga, Gonzalez, Giraldo, and Aguilar in the SD FL, moving Soto's case to that venue made operational sense.

### VIII.  <u>Extradition</u>

Defense counsel argues that his client was treated unfairly because the government did not provide her with an opportunity to voluntarily surrender.  First, as a general practice the DOJ does not notify a defendant who resides in a foreign country that he or she has been charged. Second, the government had received reliable information that after December 2019, defendant Nancy Gonzalez would no longer travel to the U.S. for fear of being arrested.  Third, the government received intelligence that Ms. Gonzalez was intending to move from Colombia to Panama.  Fourth, the Colombian National Police who were pursuing their own criminal investigation of Nancy Gonzalez and her company C.I. Diseño Y Moda Internaccional for conspiracy, smuggling and illicit use of a renewable resource, advised the FWS Liaison in South America against notifying Ms. Gonzlez of her pending criminal case in the U.S.[8]

### IX.  <u>Alleged *Brady* violation</u>

---

[8] The United States finds generally unpersuasive, and of little probative value, affidavits of prior counsel of defendant Gonzalez, one several years old – suggesting what they believe their client might have done had advance notice been provided. The speculative and conclusory nature of the affidavits is self-evident. It is roughly akin to counsel vouching for a client to secure more favorable bond conditions, but even less relevant in the current context.

The defense falsely alleges that the documents provided by the government on April,4, 16 and 17 constitute *Brady* material.   The government refutes this characterization.   The documents produced on April 4th were FWS Reports of Investigation (ROIs) which documented administrative matters and two interviews of defendant John Aguilar, conducted on February 22, and March 7, 2024, resulting in evidence that was incriminating to the Gzuniga and Gonzalez.  N no Brady information was imparted.  Once the ROIS were approved and processed, they were turned over to the defense.  The documents produced on April 16th consisted of spreadsheets listing retail and sample sale prices of Nancy Gonzalez handbags – none of which was information favorable to the defense and, more importantly, was within Gzuniga and Gonzlez's possession and control.  Likewise, were the documents provided by the government on April 17th - nine emails which were copies of those sent by defendant Gzuniga, its parent company CDMI, or their broker, to the FWS requesting permission to import handbags via passenger airlines. None of these documents cast any doubt on the charges brought in the indictment to which the defendants pled guilty.

## X.  <u>Conclusion</u>

For the foregoing reasons, the Government respectfully submits that a sentence for Nancy Gonzalez of 57 to 71 months imprisonment is sufficient, but not greater than necessary, to meet the goals of Section 3553(a).

Respectfully submitted,

MARKENZY LAPOINTE
United States Attorney
Southern District of Florida
By:  *Thomas A. Watts-FitzGerald*
Thomas A. Watts-FitzGerald
Assistant United States Attorney

TODD KIM
Assistant Attorney General
Environment & Natural
Resources Division
United States Department of Justice


By: *Richard J. Powers*
  Richard J. Powers
  Senior Trial Attorney
  Environmental Crimes Section